IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                                             CR No. 18-2419 JCH

RUEBEN VINCENT MAESTAS,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Rueben Vincent Maestas's Motion to Suppress (ECF No. 35). The Court held a hearing on the motion on December 11, 2018. The Court, having considered the motion, briefs, evidence, applicable law, and otherwise being fully advised, concludes that the motion to suppress should be granted.

    **I.**     **FACTUAL BACKGROUND**

The Dennis Chavez Federal Building ("Federal Building") is located at 500 Gold Street in Albuquerque, New Mexico, and houses multiple federal agencies, including the Fish and Wildlife Service ("FWS"), Housing and Urban Development, the Veterans Administration, and the Bankruptcy Court. Dec. 11, 2018 Hr'g Tr. (hereinafter "Hr'g Tr.") 7:2-9:10. Although the agencies operated from 8:00 a.m. to 5:00 p.m., there were federal employees working for the agencies who stayed in the building after hours. *Id.* at 9:20-10:5. Christopher Sena, a Protective Security Officer ("PSO"), is a federal contract worker under the Federal Protective Services ("FPS") who at the relevant time was assigned to the Dennis Chavez Federal Building. *Id.* at 5:21-7:11, 61:25-62:6.

He is not a federal employee, nor is he a law enforcement officer. *Id.* at 41:17-18, 49:6-7. His duties at the time included providing security for and patrolling the grounds to prevent vandalism at the Federal Building and the Federal Courthouse at 421 Gold Street, which is located catty-corner to the Federal Building. *See id.* at 7:12-8:13. At the time of the incident, the FPS maintained heightened security vigilance at the federal building because it had been shot at on several different occasions within the past three years. *Id.* at 12:18-13:4, 64:6-65:1. PSOs were to patrol more in the public eye so the public would be aware security was present. *Id.* at 13:9-14. As a PSO, Sena does not have arrest authority off federal property. *Id.* at 49:11-13.

On March 20, 2018, at approximately 7:30 p.m., Sena was on duty, wearing his full uniform displaying his badge with the company logo and man number. *See id.* at 6:24-7:4, 13:15-22, 62:7-21. A few employees were present in the building at the time. *See id.* at 10:6-21. Sena was escorting an FWS employee to her car in a parking garage for safety reasons. *See id.* at 14:18-15:19, 23:20-24:4. They walked down the steps of the Federal Building and began walking west on the sidewalk between Gold Street and the federal property on which the Federal Building is located. *See id.* at 15:14-22, 21:24-23:13; Gov.'s Hr'g Ex. 1 ("Video 1"). The sidewalk upon which they walked was not federal property, but the adjacent area to the south of the sidewalk was federal property. *See* Hr'g Tr. 21:24-23:13; Gov.'s Hr'g Ex. 2 ("Video 2"). Directly north across the street was an occupied apartment building. *See* Hr'g Tr. 16:19-25.

A movie was filming on Fifth Street near the Federal Building. *Id.* at 12:9-17. There was pedestrian traffic from a bus stop located in front of the Federal Building, as well as heavier traffic on Gold Street due to the diversion of traffic around the movie set. *See id.*. Movie set equipment semi-trucks were parked in front of the apartment building. *See id.* at 17:1-7; Video 1.

As he walked westward, Sena heard a loud pop and turned around 180 degrees to look

towards where the sound came, thinking it was a gunshot. *See* Hr'g Tr. 18:1-4, 44:1-18, 46:17-23. He did not immediately see anyone. *See id.* at 44:14-45:3. A few seconds later, Sena saw two persons walking on the sidewalk in front of the apartment building between the semi-trucks. *See id.* at 18:12-19, 46:23-47:1; Video 1. The first person was a man later identified as Defendant Maestas. Hr'g Tr. at 18:17-21. The second person worked security for the movie set and was stationed on the corner of Fifth and Gold Streets. *Id.* at 18:21-23. The FWS employee told Officer Sena, "Look, there is glass." *Id.* at 19:16-19. The glass was approximately 30 feet from where Sena and the FWS employee stood. *Id.* at 45:11-23. None of the glass touched him or the FWS employee; all the glass was approximately 30 feet away from them. *Id.* at 55:25-56:12. From the location of the glass, Sena believed that the bottle hit the curb and shattered across the sidewalk and up the steps of the Federal Building. *Id.* at 19:23-20:4. Sena shifted believing the sound came from a gunshot to a thrown bottle. *Id.* at 19:19-22. Sena did not observe the bottle being thrown because he was facing the opposite direction. *See id.* at 43:11-25; Video 1. Nor had he heard any yelling about the bottle being thrown. Hr'g Tr. 55:21-24.

Sena and the FWS employee walked west towards the corner of Sixth and Gold Streets while he watched the legs of the pedestrians visible under the semi-truck as they walked on the sidewalk by the apartments. *See id.* at 19:4-9, 48:1-10; Video 1. When he saw the person working security for the movie emerge from behind the semi-truck, he asked her if the man in front of her (later identified as Defendant Maestas) threw the bottle, and she responded, "yes." *See* Hr'g Tr. 24:20-25:1. Sena and the FWS employee continued walking west towards the corner at Sixth and Gold Street. *Id.* at 20:5-8.

Maestas began walking north on Sixth Street toward Central Avenue. *See id.* at 24:6-9. Sena saw three people on the northwest corner of Sixth and Gold Streets near Maestas who were

3

wearing uniforms marked "fugitive recovery agents."[1] *See id.* at 24:6-12, 49:14-22; Video 2. Sena believed them to be providing security for the movie. *See* Hr'g Tr. 24:9-12. Sena told them, "Hey, heads-up, that guy just threw a bottle at us and he is moving your way." *Id.* at 50:4-7. The man said "ok," then turned around, went back to his post and told the other men. *See id.* at 25:17-23. The other fugitive recovery agents went after Maestas. *See id.* at 25:21-24. Sena watched them while remaining at the corner. *See id.* at 26:9-10; Video 2.

At that time, Sena did not know the fugitive recovery agents were going to bring Maestas to him. Hr'g Tr. 56:21-24. When Sena saw the fugitive recovery agents escorting Maestas towards Sena, Sena radioed Inspector Jose Carrillo, an FPS Federal Law Enforcement Specialist and PSO Program Manager for Region 7, for direction. *See id.* at 26:9-14, 56:15-19, 60:15-61:12. Sena informed Inspector Carrillo that he had just had a bottle thrown towards him and another federal employee and the individual was coming back to his location and asked if they should detain him. *See id.* at 26:17-22, 62:16-21. Inspector Carrillo said he was on his way. *See id.* at 26:23-25.

The fugitive recovery agents brought Maestas to the corner on the sidewalk where Sena was standing. *See id.* at 27:1-6; Video 2. Sena escorted Maestas off the street onto the curb. *See* Hr'g Tr. 54:9-15. At that time, Maestas was standing on the west side of the lamppost on the City sidewalk, not on federal property. *See* Hr'g Tr. 51:9-25, 55:3-6; Video 2. Sena asked Maestas why he threw the bottle at them. Hr'g Tr. 27:8-9. Maestas started clenching his fists and his jaw, his eyes darting around and sizing him up, all of which Sena believed indicated Maestas was about to attack him, so Sena began to place him in handcuffs. *See id.* at 27:10-14, 28:14-18. Sena told Maestas to drop his bag, so Maestas threw his bag down. *Id.* at 27:15-16. Maestas's bag dropped onto federal property. *Id.* at 27:22-28:1. As Sena grabbed Maestas's wrist to begin handcuffing

---

[1] The Court will refer to these men as "fugitive recovery agents" throughout this opinion. It is undisputed that they were not law enforcement officers and had no arrest authority. *See* Hr'g Tr. 49:2-15.

him, Maestas said he was HIV positive and going to infect him. *Id.* at 27:17-20, 28:22-24. Maestas then said, "Fuck the Feds," and his name was "Enoch." *Id.* at 29:1-8.

Sena began moving Maestas to a safer location, placing him by a planter ledge on federal property near the Post Office's loading dock area, where he could safely lock the cuffs and search him for weapons. *See id.* at 30:15-31:3. Maestas then started saying he had two bombs in his backpack and was "going to blow you up." *Id.* at 31:5-12. At that time, Sena and Maestas were on federal property. *See id.* at 32:4-9, 32:22-24. Sena is trained to take every threat seriously, so he treated the situation as a serious bomb threat. *See id.* at 31:21-25, 34:18-19.

Inspector Carrillo arrived in his vehicle marked with Federal Protective Service Homeland Security Police and parked. *Id.* at 32:13-21, 34:4-5, 65:10-13. Inspector Carrillo is a federal law enforcement officer, a full-time sworn salaried commissioned peace officer. *Id.* at 60:25-61:8. Inspector Carrillo's duties include enforcing federal laws, rules, and regulations while on federal property; investigating crimes, on and off federal property; overseeing security at all federally owned and leased facilities; and overseeing the PSO program. *Id.* at 61:15-21. Inspector Carrillo was wearing his full police uniform with Federal Protective Service Department of Homeland Security Police badge. *Id.* at 65:6-9.

When Inspector Carrillo approached Maestas, he told him he was with FPS and that they take these types of threats seriously. *Id.* at 67:6-10. Maestas continued cursing, "Fuck the feds," and repeating that he was going to blow them up. *See id.* at 33:15-22, 67:12-14. Sena took Defendant behind a nearby wall for "hard cover" in case of an explosion. *See id.* at 34:9-16. Inspector Carrillo conducted a protective frisk of Maestas for weapons and explosives. *Id.* at 68:18-69:7. Maestas continued to say he was HIV positive, he was going to blow them up, that his name was Enoch, and "Fuck the feds." *Id.* at 68:22-69:1. After frisking Maestas, Inspector Carrillo read

5

Maestas his *Miranda* rights, and called the Denver MegaCenter to get support from Albuquerque Police Department to divert the public away from Defendant's bags. *See id.* at 69:9-71:17. Meanwhile, Sena created a safe perimeter, directing pedestrians and traffic away from the bags. *Id.* at 35:23-36:10. Albuquerque Police Department bomb squad was called to determine if there were any explosive devices in the bags. *Id.* at 36:17-25. Ultimately, inspection revealed there were no bombs in the bag. Gov.'s Resp. 4, ECF No. 36. The Government subsequently charged Defendant with assault on a federal officer in violation of 18 U.S.C. § 111 for spitting on Inspector Carrillo during his arrest. *See* Indictment, ECF No. 16; Hr'g Tr. 72:11-73:24.

## II. ANALYSIS

Defendant argues that Sena did not have reasonable suspicion that a crime occurred, or in any event, reasonable suspicion that Defendant committed a crime for which Sena has authority or jurisdiction to make an arrest. Consequently, Defendant asserts that his seizure was unconstitutional, and all evidence derived therefrom, including his statements, DNA evidence, and any evidence that he spat on law enforcement, was tainted and must be suppressed. In response, the Government contends there was reasonable suspicion that Defendant committed the federal crime of assault to justify Defendant's detention by Sena and that Sena was authorized to detain and search Defendant.[2] The Government argues the private fugitive recovery agents were not an instrument for a government actor because Sena merely identified Defendant as a person who threw the bottle and they acted independently in escorting Defendant to Sena. Finally, the Government asserts that the fugitive recovery agents and Sena could lawfully detain Defendant

---

[2] In its briefing, the Government asserts that the private security detained Defendant under the citizens' arrest doctrine and had reasonable suspicion and probable cause "that Defendant was breaching the peace, and possibly in the commission of a felony (assault)." Gov.'s Resp. 8-9, ECF No. 36. When asked by the Court at the hearing to clarify which crimes the Government was relying upon to justify Defendant's initial detention, the Government narrowed its focus to the federal crime of assault. *See* Hr'g Tr. 83:10-84:1. The Court will therefore limit its reasonable suspicion analysis to the federal crime of assault.

under the doctrine of citizen's arrest.

## A. Sena's jurisdiction and authority as a Protective Services Officer

Congress expressly authorized "first the General Services Administration and then the Department of Homeland Security to establish regulations 'for the protection and administration of property owned or occupied by the Federal Government' and to prescribe 'reasonable' penalties of 'not more than 30 days' in prison and fines in the amounts allowed by title 18. *See* 40 U.S.C. § 1315(c) (formerly found at 40 U.S.C. §§ 318a, 318c); *cf.* 6 U.S.C. § 552 (facilitating transfer of authority from GSA to DHS)." *United States v. Baldwin*, 745 F.3d 1027, 1030 (10th Cir. 2014). Section 1315 provides that the Secretary of Homeland Security "shall protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government (including any agency, instrumentality, or wholly owned or mixed-ownership corporation thereof) and the persons on the property." Subsection (b) gives the Secretary authority to designate DHS employees,

> including employees transferred to the Department from the Office of the Federal Protective Service of the General Services Administration pursuant to the Homeland Security Act of 2002, as officers and agents for duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property.

40 U.S.C. § 1315(b)(1).

Generally, Federal Protective Services officers are authorized to enforce GSA regulations and inspect the bag of a person visiting federal property. *See United States v. Bichsel*, 395 F.3d 1053, 1055 (9th Cir. 2005); 41 C.F.R. § 102-74.370. The Government cites 41 C.F.R. § 102-74.385 for the proposition that PSOs are "other authorized individuals" who have the authority to enforce GSA regulations of federal facilities, perform searches and screenings, and conduct administrative searches. *See* 41 C.F.R. § 102-74.385 ("Persons in and on property must at all times comply with

official signs of a prohibitory, regulatory or directory nature and with the lawful direction of Federal police officers and other authorized individuals."). *See also* 41 C.F.R. § 102-74.370 ("Federal agencies may, at their discretion, inspect packages, briefcases and other containers in the immediate possession of visitors, employees or other persons arriving on, working at, visiting, or departing from Federal property. Federal agencies may conduct a full search of a person … upon his or her arrest."). Courts have upheld limited administrative searches for explosives and weapons as reasonable when persons are entering a public building. *See*, *e.g.*, *United States v. Bulacan*, 156 F.3d 963, 968 (9th Cir. 1998); *Downing v. Kunzig*, 454 F.2d 1230, 1232-33 (6th Cir. 1972). Defendant, however, was not attempting to enter the federal building. Nor is there any evidence he was on federal property until after he was escorted and detained. Consequently, this authority does not apply to justify Defendant's initial detention.

Under section 1315(b)(2), an officer or agent designated under subsection (b) may "(A) enforce Federal laws and regulations for the protection of persons and property;" "(C) make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent or for any felony cognizable under the laws of the United States if the officer or agent has reasonable grounds to believe that the person to be arrested has committed or is committing a felony;" and "(E) conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property." 40 U.S.C. § 1315(b)(2). While Inspector Carrillo testified he had authority to conduct investigations on and off federal property, Sena stated at the hearing that he did not have authority to arrest while off federal property. The Government nevertheless argues that Defendant was lawfully subject to a citizen's arrest.

### B. Whether the "fugitive recovery agents" acted as government agents

"The Fourth Amendment protects citizens against unreasonable searches and seizures by government actors." *United States v. Souza*, 223 F.3d 1197, 1201 (10th Cir. 2000). It does not apply to searches by private citizens unless there is governmental involvement in the search. *Id.* A search by a private citizen may be transformed into a governmental search implicating the Fourth Amendment if the government coerces, dominates, or directs the actions of the private person conducting the search or seizure. *United States v. Smythe*, 84 F.3d 1240, 1242 (10th Cir. 1996). To determine if the private person is an agent of law enforcement, a court examines whether the government knew of and acquiesced in the intrusive conduct and whether the party performing the search intended to help law enforcement efforts or to further his own ends. *Id.* (quoting *Pleasant v. Lovell*, 876 F.2d 787, 797 (10th Cir. 1989)). The knowledge and acquiescence terms encompass the requirement that the government agent also must affirmatively encourage, initiate, or instigate the private action. *Id.* at 1243. *De minimis* or incidental contacts between the citizen and law enforcement are not enough to implicate the Fourth Amendment, such as where a private person voluntarily turns over property belonging to another. *See id.* Both prongs must be met for the search to be deemed a government search. *Souza*, 223 F.3d at 1201.

Turning to the second prong first, that prong is clearly satisfied. There is no indication the fugitive recovery agents detained Defendant for any other purpose than to assist Sena. They detained Defendant after Sena told them what happened and immediately escorted him to Sena.

The first prong is a closer question. Sena did not instruct the "fugitive recovery agents" to detain Defendant, but he did notify them of the thrown bottle. He watched as they began bringing Defendant to him, and thus he had knowledge of the detention. Sena did not discourage them from doing so; instead, he called Inspector Carrillo for advice. After making that call, Sena detained Defendant. All the evidence indicates Sena had knowledge of and acquiesced in the fugitive

9

recovery agents detaining Defendant on Sena's behalf. Contrary to the Government's argument, this action is more than *de minimis* contact. Consequently, the fugitive recovery agents acted as government agents and Defendant's initial detention by them is subject to the Fourth Amendment.

In any event, immediately after the fugitive security agents brought Defendant to Sena, Sena began to detain him in handcuffs. At that time, Sena was acting in his capacity as a Protective Service Officer and an agent of the Government, and the detention was subject to the Fourth Amendment. Under either the Fourth Amendment or the citizens' arrest doctrine, Sena needed reasonable suspicion of a crime for the seizure to be lawful at that point. *Cf. United States v. Winder*, 557 F.3d 1129, 1135 (10th Cir. 2009) (stating that officer may detain person once he has reasonable suspicion that criminal activity has occurred); *State v. Johnson*, 1996-NMSC-075, ¶ 18, 122 N.M. 696 (concluding with respect to citizen's arrest defense "that it is not necessary that a defendant prove that in fact a felony was committed; it is enough to establish facts from which a jury can find that the defendant had a good-faith, reasonable belief that a felony had been or was being committed based on the arrestee's overt acts or other trustworthy information").

### C. Lack of Reasonable Suspicion

Regardless of whether Sena had the authority himself to detain Defendant off federal property or he was acting under the citizen's arrest doctrine, the Government has not met its burden to show Sena had reasonable suspicion of the federal crime of assault to justify Defendant's initial detention. For reasonable suspicion to exist, the officer must have "some minimal level of objective justification for making the stop," and evidence "falling considerably short of a preponderance satisfies this standard." *Winder*, 557 F.3d at 1134 (quotations and citations omitted). The Tenth Circuit in *United States v. Hathaway*, 318 F.3d 1001, 1007 (2003), held that Section 111 defines three separate offenses. First, it prohibits simple assault, defined by the Tenth

Circuit "as either an attempted battery or as placing another in reasonable apprehension of immediate bodily harm." *Id.* at 1007-08. Simple assault does not involve touching. *See id.* at 1008. Second, the Tenth Circuit defined "'all other cases'" assault as "meaning assault that does involve contact but does not result in bodily injury or involve a weapon." *Id.* Third, the statute covers "assaults resulting in bodily injury or involving a weapon." *Id.*

Although Sena had reasonable suspicion to believe that Maestas was the person who threw the bottle based on what the security officer told him she witnessed, he did not have reasonable suspicion to believe that throwing the bottle constituted the federal offense of assault. Regarding the first manner of committing the offense of assault, Sena was not aware of the bottle being thrown until after it landed with a pop. At the time he became aware of the bottle, he had no reason to fear immediate bodily harm. Had the bottle landed closer to Sena, suspicion of attempted battery might carry more weight. The bottle, however, landed 30 feet behind Sena and the FWS employee. Neither Sena nor the FWS employee had any interaction with Defendant prior to the bottle being thrown to indicate any intent by Defendant to want to hit a person with the bottle. There are not enough facts to suggest that Defendant threw the bottle in an attempt to batter Sena or another person. The second means of committing assault does not apply here because the bottle did not touch anyone. Third, a glass bottle could constitute a dangerous weapon, depending on the manner in which it is used. *See, e.g., United States v. Murphy*, 35 F.3d 143, 147 (4th Cir. 1994) (explaining that seemingly innocuous objects like rake, shoes, and wine bottle may constitute dangerous weapon if they have potential to inflict grave physical harm and are used in a manner to have potential to cause serious bodily injury). The distance between the bottle and any person in this case, combined with the lack of any interaction between Defendant and anyone in the vicinity of the bottle, does not indicate that Defendant threw the bottle in a manner intending to cause anyone

serious bodily injury.

Sena therefore lacked reasonable suspicion to believe Defendant committed the federal crime of assault and lacked grounds to lawfully detain Defendant at the time Defendant was forcibly brought to the corner and initially detained. Because Defendant's detention was not justified at its inception, his seizure violated the Fourth Amendment and the evidence derived afterwards, including the threatening statements Defendant made after his unlawful detention, must be suppressed.

**IT IS THEREFORE ORDERED** that Defendant Maestas's Motion to Suppress (**ECF No. 35**) is **GRANTED**.

_____
**UNITED STATES DISTRICT JUDGE**